Good morning, Your Honour, and may it please the Court, Damien Schiff for the Appellant Barnum Timber Company. With the Court's indulgence, I'll try and aim to save about two minutes for rebuttal. Barnum Timber has spent years amassing a significant library of information data analysis showing that Redwood Creek is not an impaired water body, that it is a healthy stream hosting a healthy population of salmon. Barnum has dutifully presented this information over the course of a decade to the Regional and State Water Quality Control Boards, and yet not once throughout any of that time has the Regional or Water Quality Control Boards, in denying Barnum's point that Redwood Creek is not an impaired water body, not once has the State or Regional Boards said why this substantial body of data analysis has been rejected. Are we here to review what the local and regional boards did or did not do? No, Your Honor. I thought we were here to review what the EPA did or didn't do. That is absolutely correct, Your Honor, and EPA — During a 30-day window of time when they had a list of, what is it, 22,000 impaired bodies of water in California? Yes, Your Honor, it is a significant amount of work for EPA to do, particularly now — And further, we're supposed to give deference to the agency in this particular situation. The deference is the highest when reviewing the agency's technical analysis and judgments involving the evaluation of complex scientific data within the agency's technical expertise. Absolutely right, Your Honor, but thankfully, this Court is not called upon to do any of that sort of Monday-morning quarterbacking review of the science, because Barnum is not arguing for de novo review of the administrative record that supports Redwood Creek's listing. Barnum is not asking for EPA to engage in anything in-depth. Rather, all Barnum is asking for is that EPA, in its necessarily cursive review of these proposed listings, actually follow its own regulations. So all you're really saying, then, if I understand your argument, the EPA has an oversight function at best, right? That's correct, Your Honor. And so, then, I want you, reviewing the integrated report and the support documentation, how does one tell that there is Barnum information or there isn't Barnum information in the report? The integrated report, included in the excerpt of record, actually includes the acknowledgment of Barnum's data. It shows a response to — You're not asking my question. My question is, I reviewed the integrated report and the support documentation. I looked in there. How do I tell, from reading that report, whether the Barnum info is there or it isn't there? Your Honor, let me make sure I understand your question. Are you asking whether EPA had access to Barnum's? Well, given the integrated report, if that's all they had in the support documentation, it's hard for me to tell whether the Barnum info is in the report or it isn't. Well, it's certainly true that what EPA receives from the State Water Board is a very truncated summary, but even EPA acknowledges that in this 30-day time period, in order to make a minimally rational decision as to whether these water bodies should be listed, it needs to have basic information. The methodology, which of course EPA goes into great detail over in its answering Really didn't answer my question. Again, if I look at the integrated report and the support documentation, I couldn't tell whether the Barnum information was there or it wasn't. Why do I look at the integrated report and the support documentation and tell that the Barnum information is not there? Where do I look there to find it? I can't find it, can you? No, that's... And... I apologize for my distance. So what we have then is we have an integrated report which goes to the EPA, their support documentation, and we can't really tell whether the Barnum info is in there or not. Then we had some discussion where the board responded in writing to comments on the report because they wanted to have the report commented on. Barnum did not even comment. And now they come forward and say the EPA is out to lunch because you didn't do... They didn't include our report. Barnum didn't do one thing when they had the chance to do it to say our info isn't there. They didn't comment at all. And the board then responded in writing to all the comments made. Your Honor, the... There is no opportunity for Barnum or any other interested party to comment to EPA directly in this process. Now, it is true Barnum submitted its information to the Regional Water Quality Control Board. That was perfunctorily dismissed, and the State Water Quality Control Board affirmed that decision, and that was sent on to EPA. But it's not Barnum's obligation to repeatedly point out to the state and then to EPA that these agencies are not following their obligations. What we're trying to do is give the EPA some chance to guess why you're really arguing here. I look first at the integrated report. I can't tell. I then look at the board responds to comments about the integrated report, and nobody comments, so there's another reason the EPA can't tell what was left in or wasn't. And the board has commented, and now it goes to the EPA. And the EPA is supposed to automatically just come to the conclusion that Barnum's information isn't here. Well, Your Honor... With a cursory review in 30 days. Your Honor, I think some context in the nature of this action is helpful because this lawsuit ultimately was filed in State court in 2003, and Barnum has had to go through several of these processes, and at some point, it becomes a bit of an exercise in futility to continue to make the same point over and over again with the agency simply saying, we've looked at it. EPA certainly knew from the materials that the State board forwarded to it that it had received information from Barnum, it had looked at it, and it said, we're not convinced. And that, of course, is ultimately the decision of the agency to make. But the agency's own regulations still require that there be a rationale, an explanation as to why this information is being rejected. I agree completely with Your Honor that the EPA does not have the ability to go into a great review of this issue, and Barnum is certainly not asking for that. Rather, we're simply asking for at least a rationale to be given as to why Barnum's data and analyses have been rejected. And EPA could certainly see from the record it had that Barnum had submitted the data. And in fact, EPA was certainly aware of it because in this most recent listing cycle in 2010, as EPA refers to in the brief, EPA actually attempts to explain why certain temperature criteria were used. And the only reason for that explanation is because of Barnum's ongoing lawsuit that is challenging the listing of Redwood Creek on the basis of, in part, using those inaccurate temperature criteria. So this is certainly not a question of Barnum or anyone else sandbagging the agencies. It's simply a question of ensuring that the Water Quality Control Boards as well as EPA make a reasoned decision, which is here, if you're not present. It goes even further than that, of course, in that EPA argues that there can't even be any substantive review because there is a total maximum daily load already assigned to Barnum Timber, or I'm sorry, already assigned to Redwood Creek. And that, we believe, is a fundamental misinterpretation of the 303D listing process, that simply because there is a TMDL assigned to a water body doesn't mean that that water body's impaired status is forever removed from judicial review and that it can never be challenged. Well, in this particular case, EPA has to, it's got 30 days, right? So it has to rely on information that's relayed to it by the State Board. The State Board, in turn, relies on information from the Regional Board. Even though Barnum Timber did submit comments to the Regional Board, the Regional Board responded to those comments, didn't it? Yes, Your Honor. And then at that point, does Barnum Timber have an opportunity to then respond to the comments? I'm not aware as to whether Barnum would have an opportunity to respond, again, to the Regional Board, but it is in theory possible Barnum has in the past presented information, I believe, in prior listing cycles to the State Water Resources Control Board. Well, there's a public comment period, right, during which Barnum Timber could have responded and identified for the State Board what was deficient about the Regional Board's response. And without that kind of a response, how is the State Board supposed to divine what Barnum Timber agreed with or disagreed with concerning the Regional Board's responses? Well, in part, Your Honor, the State Board doesn't need to divine anything, because the point is simply it is the State Board's obligation itself to provide the explanation. It's the State Board's obligation to say, okay, what we see here, the Regional Board has received this information, this data from an interested party, and has said, well we're not here challenging the State Board's actions or inactions. We're here challenging what the EPA should do or not do, aren't we? And in fact, what really happened was this report, which I can't tell whether Barnum's in or out, this report was sent out for review. Barnum had a chance to respond to it and did not respond. At that point, all the responses that were given, the Board, in writing, responded to the responses. Is that not also correct? That is correct, Your Honor, but... And then the report goes to the EPA. So Barnum, not having done anything about the report out the board, not having said anything about it, therefore the Board didn't respond to Barnum, all goes to the EPA, and the EPA in 30 days is supposed to come up with Barnum's stuff isn't in the report when you can read the report and not know whether it's in there or not. Well, Your Honor, if I may clarify, the argument is not that EPA had to see Barnum's data in the first instance. And the argument is not that EPA had to divide that from the truncated material that the State provides to EPA in this process. Barnum acknowledges that this is not going to be a significant review simply by the nature of the process, the number of water bodies involved. Barnum fully acknowledges that. But what is clear from what EPA did receive is that there were data submitted showing that Redwood Creek is in a healthy condition and that it is not impaired. And then what was also clear from the same report is the State and regional boards saying, we looked at that data and we're not convinced. But yet EPA's regulations are very clear that it's not enough for the State to say we've looked at it and we're not convinced, the State must explain. Otherwise, the process becomes completely arbitrary and there is much less a perfunctory review, there's no review at all. It's simply whether the I's were dotted and the T's crossed. And that is a complete abdication of EPA's responsibilities under Section 303D. There has to be some minimal review to ensure that this is not a farce. And EPA and yes, Your Honor. Kennedy. I was going to say, do you want to go to your second point or do you want to rest at that? Well, I, with the Court's indulgence, will just reserve the balance of my time. Thank you. Okay. May it please the Court. My name is Robert Stockman. Here on behalf of the U.S. Environmental Protection Agency. We ask this Court to affirm the district court's judgment. I'm going to try to just touch on four issues today. First, the nature of EPA's limited oversight role in the 303 program. I think we've been over that. Okay. What's your next point? The second is that the record reviews that California, the record that EPA reviewed established that California had evaluated all the available data before it, reached conclusions, explained its rationale, responded to comments at the regional board level, and that Barnum's contrary arguments in large part turn on a slight misreading of some of California's decisions. And I think the commenting period is key here. And I'd like to note, start with that, which is that there was, Barnum submitted comments to the regional board. And the regional board provided responses to that at pages 73 to 75. Barnum considers those inadequate. But then the regional board released its staff report and its integrated list, which listed the data and its conclusions. And then the state board had a comment period in which Barnum could have submitted its reasons for thinking that the regional board's responses were inadequate. And Barnum failed to do so. And here, I think it's very valuable to recognize this isn't just a futility issue, because Barnum actually never commented in the administrative process on the use of the EPA salmon guidance for the 18-degree temperature, which is a huge part of their brief. At some point, this entire package of material lands at your client's doorstep, correct? Yes, Your Honor. And let's just suppose, hypothetically, that for some reason out of the blue, the person, the designated official at EPA responsible for making recommendations to the final decision maker, wanted to look at Redwood Creek. He grew up near Redwood Creek or whatever, and he wanted to find out about the creek, the sediment, and other levels, and how it became listed as impaired, how long it had been listed. That information would have been in there somewhere. The integrated list would be in there, and he would review that. If he thought he needed further information, there's a discretionary authority on the part of EPA to ask for further information, but that is discretionary. It's not required, and it doesn't do it all the time. Try it this way. Let's suppose the entire package that arrived at EPA were digitized, and someone at EPA did a word search for Barnum Timber. Would something have come up? Yes. What would have come up? What would have popped up is the regional board's response to comments, which are on page 73 to 75 of the excerpts of record. And they would have said, Barnum submitted the following comments. They think the waters are good for the following reasons. We have evaluated some of that in the past. We don't think it meets attainment standards. For example, Barnum argues there's lots of salmon. Well, the question here isn't focused so much on the salmon population, but what criteria are necessary for the salmon's health. So it's a concise response. And then that would be it. Now, if you search for Redwood Creek, you'd get to the integrated listing, where it explains that it looked at the temperatures measured in the creek. It looked at multiple studies, and it also looked at the EPA salmon guidance, which establishes that for a non-core juvenile breeding area, which is this, salmonids thrive or require an 18-degree Celsius temperature. Is the 30-day review window statutory? It is statutory, and EPA actually met it this time, which is impressive. It is a statutory requirement, which is part of why EPA has adopted regulations that don't involve the state sending them all of the data and the full administrative record, because Congress's decision to give 30 days indicates that Congress meant for the states to have the primary role, particularly in the non-point source program. That window cannot be expanded? Not by statute. I mean, no. I mean, EPA sometimes doesn't meet the deadline, but someone could then sue over that and argue that EPA needs to meet the deadline. So that is the statutory requirement that EPA must meet. But just to point this out and to refer quickly to the court's record, but not the administrative record, Barnum has provided the district court with its comment letters, and not one of them refers to the EPA salmon guidance. They all object to a 14-degree, 14.8-degree Celsius temperature that California used in prior listing cycles. But they never mentioned the 18-degree temperature, and they may not have known about it at that point because the regional board then released its reports. But that's why it's so key to then go to the state board and explain why you don't feel like you were listened to. Because if they had looked at the integrated report that the regional board released, they would have realized, oh, they're using a different study, it uses a different temperature metric, and here's why we think that's wrong. Is there a basis in this whole process where if Barnum Timber went back to the regional and state boards and presented its additional or new or more complete information, and the local and state boards persisted in listing Redwood Creek as impaired, that that isolated package of information could come up to EPA for review without being included in some 22,000 pages or 22,000 other impaired streams? The way that usually happens is that someone does it at both of them. I think that the answer to that question is yes. Yes, I think so. And here's how it happens. I apologize. Yes, I think so. The way that usually happens is that someone comments at the regional level and then the state level. And when EPA reviews the data, the responses, it says, I think we need to look at this more. And actually, sometimes the state requests, doesn't decide and asks EPA to help it decide on a water. So that is a discretionary authority that EPA has. So usually what it does then is it partially approves and disapproves the list and makes its rulings. And then for a handful of waters, it will say, provide us further information. But it would have to, it is in that initial packet where the responses to comments would indicate that. But the problem here is the failure to exhaust before the state board meant that the last set of comments, there's no place where Barnum says, here's why you're getting it all wrong. And the state board either could have corrected itself if it agreed with Barnum, or more fully articulated its thoughts. And then EPA could say that and say, that sounds not like a rationale. Let's look at that. But here, the rationales look rational. And EPA is deferential in this program. There's one further point on just the salmon guidance I would like to make in response to something opposing counsel said in this very, about whether or not it's reasonable to use it in California. In this decision document, EPA was looking at the listings for other California rivers, including the San Joaquin River and its tributaries. And EPA, and California had not acted on whether those were temperature impaired, had not listed them as temperature impaired. But the data indicated that they were. And in that case, EPA did step in and say, we think these are impaired. You didn't list them. You didn't give a reason why. And it discussed the salmon guidance because it turned to it. And it said, and I quote, this is an excerpt of record of 53. The studies compiled in the guidance and associated papers address the full geographic extent of salmonid populations, including California. The recommended numeric criteria to protect cold water salmonids in this response were recommended for use by California's Department of Fish and Game. EPA believes that the Region 10 guidance and associated technical issue papers provide the most comprehensive compilation of research related to salmonid temperature requirements available. End quote. The key there is that's not about this river at all. But it is evidence in the record that shows that EPA was very familiar with the salmon guidance. I mean, they helped create it. And they thought its use here was completely appropriate. So in that circumstance, the North Coast Board had decided on its own to rely on the salmon guidance. But EPA could review that and easily conclude that was reasonable in light of its own judgment, which is documented in the record and has nothing to do with this litigation. So it's not post hoc. Unless there are further questions about the temperature impairment, I'd like to quickly touch on the sediment TMDL. And I think part of the issue here is a misunderstanding about how the 303D program works, which is that the goal of the 303D program is to get these programs running at the state level. But the state decides how and if to implement it. So the first step is the identification of impairments of waters. And that's required in 303D1A. And then that triggers an obligation for the state to develop a TMDL. And with respect to Redwood Creek, the TMDL was finished in 1998. And that's under D1C. I've got a question. May not have occurred to you, but I'd be interested in the agency's input. Let's suppose as we sit here today, push all the procedural requirements away, that in fact, Redwood Creek is not impaired, or that it's entirely possible that it's not impaired. Would the agency be willing to sit down with Barnum Timber and see if this can be mediated? I think no, Your Honor, and there's a Boy, that's an answer we don't like to hear. No, I know. But a few things are occurring to me. First, it is, we don't think that's right. I mean, the evidence in the record indicates it's impaired. But set that aside. We're trying to get into the mindset of assuming that a completely neutral mediator couldn't convince the agency that it either is not impaired right now, or that with one or two attainable, verifiable steps, it could reach that point. Is that what you're telling us? I don't think that could be proven. But also, there's a second reason this would be a problem, Your Honor, which is that at this point, it's California that is implementing the TMDL and the sediment impairment. It's California. One of the great things about mediation is that if both parties are willing and have an open mind, other people can be brought in. Happens all the time. Sounds like you're about to say this is above my pay grade. That's definitely true. Yes, Your Honor, it is above my pay grade. And I think the other thing I would say, though, is that the TMDL has now been incorporated into California's continuing implementation plan. It's California that decides what to do and how to protect the watershed. And it is doing so by placing certain restrictions on timber usage and such. You know, I had a client one time when I was in private practice come in. His kid had been hit by a city garbage truck. And I started to explain the whole doctrine of sovereign immunity. And my client stopped me and said, listen, all I care about is can my kid get compensated for his injuries because this driver hit him with the garbage truck? So if we can understand the agency's desire to maintain a fluidity of the line of review and that sort of thing. But at the end of the day, isn't the end result in this specific instance to determine now and for the future whether Redwood Creek is in fact impaired? Or whether with certain specific steps attainable and verifiable, it could be put in that position? Actually, no. That's not what this process is about at this point. Oh, I understand this process. Your Honor. This is — this is — this, in some respects, is what's wrong with litigation and agency review, et cetera. But I — just as one judge on this panel, I've talked with my colleagues about this. I would encourage you to talk to your superiors about this. This is resolvable. If we can — if a prior panel of mine sent for a resolution, the issue of dust in the air in Imperial County and obtaining ambient air standards. And that involved the State, the Feds, the locals, farmer groups, et cetera. That case was resolved by mediation. Everybody's happy. I — I mean, we're always willing to discuss mediation, Your Honor, and I will talk to my superiors. But I do want to emphasize that the sediment TMDL has been in place since 1998. The time BARDA challenged that has been run. It is now California's job to implement it. And they have the choice about how to do so. And Barnum can always go to California and discuss that with them. And it — it establishes what the goals are. And if California were convinced to change it — But they hire more lawyers. They go back, et cetera, et cetera. Can't you envision a situation in which everybody sits down at the table and behaves reasonably? I would like to. I'm done. I'm done with that line. No, I — You're taking too much of your time. No, I take your point, Your Honor. And we are always willing to discuss mediation. And I will discuss it with my superiors. Thank you very much. Anything else in your argument? I guess my main question is if the Court has any questions about any of the factual. I don't. No, we don't. Well, then, I truly appreciate your time. Thank you, Your Honor. Thank you. Thank you. Thanks for coming out. Thank you for your argument. Counselor, did you want to respond at all? Well, on the — on the great principle that something is better than nothing, I think Barnum would be — would be open to the idea of mediation if the agency is. Because ultimately, from Barnum's perspective, it's just about having the agencies look at the data and see if, in fact, a reassessment is appropriate. Thank you for your argument. Thanks for coming in. Let me ask you one question that's related to what Judge Hawkins was talking about with EPA counsel. Have you reached out and talked or given to the regional board or the state board or the EPA your analysis of how the board's original response to your submission was deficient? Basically, given them an alternative analysis, something to talk about if mediation were to occur. Well, yeah. I should say, again, because of the long history of this case, it began in state court against the State Water Resources Control Board. Barnum sued the board in state court. We were dismissed on the grounds that EPA was a necessary but indispensable party, and we were told to file suit against EPA in federal court. So the State Water Board, since 2003, has been aware of Barnum's basic critique of the Redwood Creek listing process. All right. Thank you. Thank you very much. Case 1215115, Barnum Timber versus the United States Environmental Protection Agency is submitted.
judges: Hawkins, Smith, Nguyen